ROCKY FORD HOUSING AUTHORITY
et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE et al., Defendants.

Civ. A. No. 76–495.

United States District Court,
District of Columbia.

Jan. 18, 1977.

Florence Wagman Roisman, Lee P. Reno, Washington, D. C., for plaintiffs.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Karen I. Ward, Asst. U. S. Attys., Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This case is before the Court on plaintiffs' motion for class certification and on cross-motions for summary judgment. The case arises out of the refusal of the Secretary of Agriculture to implement the "rural

rent supplement program" created by section 514 [1] of Title V of the omnibus Housing and Community Development Act of 1974 [the 1974 Act]. If implemented, this program would make rental housing available to low-income families in rural areas at a rate not to exceed 25 per cent of income. *See* H.R.Rep. No. 93–1114, 93d Cong., 2d Sess. 385 (1974). The funds for this program would be derived from "excess rental charges," as provided in 42 U.S.C. § 1490a(a)(2)(C), and from the Rural Housing Insurance Fund [RHIF], as provided in 42 U.S.C. § 1490a(c), which would be reimbursed for such outlays by annual appropriations.

There are two classes of plaintiffs, low-income individuals in rural areas and sponsors of multifamily housing financed by FmHA. They assert that section 514 *mandates* the Secretary to implement the rural rent supplement program. Alternatively, they claim that if the Secretary had discretion to decide whether to implement section 514, he has abused that discretion. Finally, they argue that even if the Court concludes that the Secretary has discretion not to implement the program *and* that he has not abused such discretion, the Court should still grant relief to the plaintiffs because the defendants have failed to comply with the Impoundment Control Act of 1974. 31 U.S.C. §§ 1400 *et seq.* (Supp. V 1975). The plaintiffs seek declaratory and injunctive relief ordering the defendants to implement the section 514 program.

In their cross-motion for summary judgment, the defendants take the position that none of the named or class organizational plaintiffs have standing to bring the present action and that not all of the named or class individual plaintiffs have standing. The Court will treat this aspect of defendants' summary judgment motion as a motion to dismiss. For this and other reasons,[2] defendants also oppose any class action certification in this case. With regard to the merits, the defendants assert that section

---

1. Section 514 of Title V of the 1974 Act amended section 521 of the Housing Act of 1949, as added by the Housing and Urban Development Act of 1968, and codified at 42 U.S.C. § 1490a. Section 514 of the 1974 Act, in creating the rural rent supplement program here at issue, added the following language to 42 U.S.C. § 1490a:

(a)(2)(A) The Secretary may make and insure loans under this section and sections 1484, 1485, and 1487 of this title to provide rental or cooperative housing and related facilities for persons and families of low income in multifamily housing projects, and may make, and contract to make, assistance payments to the owners of such rental housing in order to make available to low-income occupants of such housing rentals at rates commensurate to income and not exceeding 25 per centum of income. Such assistance payments shall be made on a unit basis and shall not be made for more than 20 per centum of the units in any one project, except that (i) when the project is financed by a loan under section 1485 of this title for elderly housing or by a loan under section 1484 of this title and a grant under section 1486 of this title, such assistance may be made for up to 100 per centum of the units, and (ii) when the Secretary determines such action is necessary or feasible, he may make such payments with respect to more than 20 per centum of the units.

(B) The owner of any project assisted under this paragraph shall be required to provide at least annually a budget of operating expenses and record of tenants' income which shall be used to determine the amount of assistance for each project.

(C) The project owner shall accumulate, safeguard, and periodically pay to the Secretary any rental charges collected in excess of basic rental charges as established by the Secretary in conformity with subparagraph (A). These funds may be credited to the appropriation and used by the Secretary for making such assistance payments through the end of the next fiscal year.

\* \* \* \* \* \*

(c) There shall be reimbursed to the Rural Housing Insurance Fund by annual appropriations (1) the amounts by which nonprincipal payments made from the fund during each fiscal year to the holders of insured loans described in subsection (a)(1) of this section exceed interest due from the borrowers during each year, and (2) the amount of assistance payments described in subsection (a)(2) of this section. The Secretary may from time to time issue notes to the Secretary of the Treasury under section 1487(h) of this title to obtain amounts equal to such unreimbursed payments, pending the annual reimbursement by appropriation.

2. *See* section I(B) *infra*.

514 does not mandate implementation of the rural rent supplement program but rather confers a discretionary authority on the Secretary. They further argue that the Secretary's decision not to implement the program is reasonable and not an abuse of discretion since "nearly identical benefits" will be provided to the intended beneficiaries of section 514 as a result of the Secretary's *Memorandum of Understanding* with the Department of Housing and Urban Development [HUD]: Pursuant to this Memorandum, rental assistance for low-income families residing in rural areas would be made available pursuant to section 201(a) of the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f,[3] rather than pursuant to section 514. Finally, defendants assert that plaintiffs fail to state a claim upon which relief can be granted under the Impoundment Control Act and that the refusal to implement the section 514 program is not an "impoundment" within the meaning of the Act.

## I. *Defendants' Motion to Dismiss for Lack of Standing*

The first issue that the Court must address is that of standing. The defendants contend that (1) not all of the named, individual plaintiffs have standing, and (2) no named, organizational plaintiff has standing.

## (A) *Individual Plaintiffs*

The defendants admit, and there can be no doubt under even the most restricted reading of the law of standing, that those plaintiffs who (1) presently live in "qualified" housing projects,[4] (2) presently pay in excess of 25 per cent of their "adjusted income" for rent,[5] *and* (3) would pay no more than 25 per cent of their adjusted income for rent if the section 514 rural rent supplement program were implemented have standing to maintain this action. The Court concludes that five named plaintiffs—Josie Burciago, Della Martinez, Emilla Camacho, Connie Warman, and Rafael Villagran—have sufficiently established these three facts to support their standing.

The remaining two named, individual plaintiffs—Julia Middleton and Blanch Mullen—currently live in "nonqualified" housing. Plaintiff Julia Middleton states in her affidavit that she has already completed an application for a unit in the Lambertville project being constructed by plaintiff Northwest New Jersey Housing Development Corporation. In her affidavit, plaintiff Blanch Mullen specifically states that she desires to and would live in the Lambertville project if she could afford it. Because of the extremely low incomes of both these plaintiffs, they now pay and, unless they receive rental subsidies, will continue to pay far more than 25 per cent of their adjusted income for rent. Notwithstanding these undisputed assertions, the defendants contend that the most recent Supreme Court decisions on standing, *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Simon v. Eastern Kentucky Welfare Rights Organization [Eastern Kentucky]*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), preclude plaintiffs Julia

3. This program is known as the "section 8" program because it was added by the 1974 Act to section 8 of the United States Housing Act of 1937.

4. The section 514 rural rent supplement program, if implemented, would apply to multifamily housing projects that have been granted loans pursuant to sections 514, 515, and 517 of the Housing Act of 1949, as amended. 42 U.S.C. §§ 1484, 1485, 1487 (1970), *as amended,* (Supp. V 1975). Projects funded by such loans are termed "qualified" for rural rent supplements.

5. Although regulations have not been promulgated for section 514 due to the Secretary's decision not to implement the rural rent supplement program, the parties seem to agree that the term "income" as used in section 514 should not be interpreted to mean gross income. Rather, both parties appear to contemplate that the definition of "adjusted annual family income" as provided in 7 C.F.R. § 1822.-3(*o*) (1976) would be applicable to the section 514 rent supplement program if the program were implemented. This definition of "adjusted income" includes a 5 per cent deduction from gross income for all families as well as a $300 annual deduction for each minor child residing at home.

Middleton and Blanch Mullen from maintaining the present action.

■ Although the precise parameters of standing are none too certain in the wake of *Warth* and *Eastern Kentucky*, it seems clear that both of these plaintiffs have standing to bring this case. *Warth* requires that a plaintiff "must allege facts from which it reasonably could be inferred that . . . there is a substantial probability" that the plaintiffs would be able to find the desired low-cost housing "if the court affords the relief requested." 422 U.S. at 504, 95 S.Ct. at 2208. Certainly it must be more than "speculative" that the exercise of the Court's remedial powers would result in the availability to the plaintiffs of the low-cost housing they seek. *Eastern Kentucky*, 426 U.S. at 42, 96 S.Ct. at 1926. More specifically, the *Warth* Court suggested that plaintiffs challenging zoning restrictions would have standing "as applied to particular projects that would supply housing within their means, and of which they were intended residents," 422 U.S. at 507, 95 S.Ct. at 2209, even if the plaintiffs possessed no "present contractual interest." 422 U.S. at 508 n.18, 95 S.Ct. 2197.[6]

On the basis of the foregoing it seems clear that the determination that plaintiffs Julia Middleton and Blanch Mullen have standing in the present case is not only not inconsistent with *Warth*, but is in fact expressly sanctioned by the Supreme Court's opinion: If this Court grants the plaintiffs the relief they request and orders the defendants to implement the section 514 rural rent supplement program, there is a substantial probability that the particular project in which they seek to live would be able to provide them with housing at rentals no higher than 25 per cent of their adjusted incomes.

### (B) *Organizational Plaintiffs*

The defendants contend that neither the Rocky Ford Housing Authority [Rocky Ford], the Northwest New Jersey Housing Development Corporation [Northwest], nor the Community Development Board of Avon Park, Frostproof, and Wauchula Area, Inc., [Avon Park] have standing to challenge the Secretary's decision not to implement section 514. For the following reasons, the Court concludes that both Rocky Ford and Northwest have standing, but that Avon Park does not.

Plaintiff Rocky Ford is a public housing authority that owns and manages two "qualified" low-income housing projects, which contain a total of 40 units, in the City of Rocky Ford, Colorado. Plaintiff Rocky Ford states that it requested rental assistance for its two projects on January 30, 1976, but was told that no assistance would be available because section 514 was not being implemented. It asserts that present tenants who are forced to pay more than 25 per cent of their income for rent have "constantly" fallen behind in their payments and that these arrearages are causing it serious financial difficulties. Rocky Ford alleges that implementation of section 514 would better enable tenants to meet their rents and thus alleviate the Authority's financial problems.

---

6. The fact that these plaintiffs presently have no "present contractual interest" in a particular project is plainly immaterial under the authority of *Warth* and the recent decision by the Court of Appeals for the District of Columbia Circuit in *Krueger v. Morton*, 176 U.S.App.D.C. 233, 539 F.2d 235 (1976). The plaintiff in *Krueger* sought to compel the Secretary of Interior to process his application for a coal prospecting permit. The Secretary refused on the ground that he had suspended the program. On appeal, the defendant argued that the plaintiff had no standing to sue. The Court rejected this argument in its entirety:

[Appellee] has confused lack of an established property interest with lack of standing to question allegedly unjustifiable obstacles to the perfection of such an interest. It is true that applicant acquired no vested interest by the mere filing of his application. But he did have the right to avail himself of the application route in an effort to perfect an interest to the extent that this was not precluded by law or some valid exercise of the agency's discretion. Were it otherwise an applicant would be unlawfully deprived of the right to pursue his application to the point of a consummated interest without means for effective complaint.

*Id.* at 238 (footnote omitted).

Plaintiff Northwest is presently building a 14-unit rental project in Lambertville, New Jersey, to help "meet the housing needs of the low-income elderly residents of Lambertville." The project has been approved by FmHA for a section 515 loan, and it is thus "qualified" for section 514 rental assistance. Northwest alleges that its projected rental prices will certainly be greatly in excess of 25 per cent of the income of the low-income elderly whom the project was intended to serve.

The essence of defendants' position is that neither Rocky Ford nor Northwest have suffered (1) any injury "in fact" or (2) an interest "arguably within the zone of interests protected or regulated" by section 514. *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In assessing defendants' argument, it must be remembered that

> . . . Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute.

*Warth v. Seldin, supra*, 422 U.S. at 514, 95 S.Ct. at 2213. Thus, unlike in *Warth*, where no federal statute was involved, this Court must examine the statutory scheme in considering the plaintiffs' alleged injuries.

The defendants are correct, of course, in asserting that the primary intended beneficiaries of section 514 are low-income persons residing in rural areas who are unable to find decent rental housing for 25 per cent or less of their income. However, it is certainly possible for Congress to have intended that section 514 serve the interests of housing sponsors as well.[7] The Court, after analyzing the entire rural housing scheme enacted by Congress, concludes that Congress intended to invest housing sponsors with a legally cognizable interest in providing decent housing to a particular type of tenant—low-income persons. Since it is clear that Rocky Ford is, and that Northwest will be, forced, in the alternative, to incur financial injury as a result of the inability of low-income tenants to pay in excess of 25 per cent of their income for rent *or* to suffer injury to their statutory interest in providing housing to low-income persons, *cf. Village of Arlington Heights v. Metropolitan Housing Development Corp.*, —— U.S. ——, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Court concludes that both Rocky Ford and Northwest have standing in the present case. *See Commonwealth of Pennsylvania v. Lynn*, 362 F.Supp. 1363 (D.D.C.1973), *rev'd on other grounds*, 163 U.S.App.D.C. 288, 501 F.2d 848 (1974); *Battles Farm Co. v. Hills*, 414 F.Supp. 521 (D.D.C.1976). These plaintiffs are clearly asserting their own rights and not, as defendants contend, the "putative rights of third parties." *Warth v. Seldin, supra*, 422 U.S. at 514, 95 S.Ct. 2197.

Moreover, the Court finds further support for its conclusions on these organizations' standing in the administrative scheme established by section 514. Any contracts for rental assistance pursuant to this section would be between the project owner and the Secretary and all payments would be made directly to the owner. Furthermore, section 514 imposes significant duties

---

**7.** The recent decision by this Circuit in *National Association of Neighborhood Health Centers, Inc. v. Mathews*, 551 F.2d 321 (D.C.Cir. 1976), provides an analogous situation under section 603(a)(4) of the Hill-Burton Act, 42 U.S.C. § 291c. The defendants challenged the standing of a named plaintiff that was a neighborhood health center. Although the residents of "designated poverty areas" were clearly the primary beneficiaries of the funds in issue, the court held that the health center had standing "as a possible beneficiary of a federal program aimed at the construction of medical facilities [which] seeks to furnish adequate medical services to all people, another goal of the Act." At —— n. 44.

Certainly the fact that an interest might be considered "intangible" does not preclude a finding that the constitutional aspects of standing are satisfied. *See Gray v. Greyhound Lines, East*, 545 F.2d 169, 175 (D.C.Cir. 1976), *citing Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, —— U.S. ——, ——, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

on the owner of any assisted project. In view of the essential role that project owners would play if section 514 were implemented, the Court feels confident that Congress intended that they have the right to sue to protect their interests.

■ With regard to plaintiff Avon Park, however, the Court agrees with the defendant that Avon Park's claims should be dismissed. The complaint alleges that Avon Park has applied to FmHA seeking a section 515 loan to construct 52 units of rental housing.[8] In addition, it alleges that Avon Park has applied for rental assistance pursuant to section 514 for 10 of the units. Unless its section 515 loan application is approved, plaintiff Avon Park would not even qualify for rental assistance. Moreover, until the section 515 loan is approved, there will not even be the probability that the proposed project will be completed. Thus, the Court must conclude that plaintiff Avon Park's complaint fails to allege a "live, concrete dispute." *Warth v. Seldin*, supra, 422 U.S. at 517, 95 S.Ct. 2197. Accordingly, the Court will dismiss plaintiff Avon Park's claims against the defendants.

## II. *Plaintiffs' Motion for Class Certification*

The named, individual plaintiffs seek class action certification pursuant to Fed.R. Civ.P. 23 as representatives of all individuals who are now or in the future become (1) eligible to receive the benefits of the rural rent supplement program;[9] (2) tenants or applicants of the proposed class of organizational plaintiffs; and (3) who are now pay-

ing or will in the future have to pay more than 25 per cent of their adjusted income for rent. The named, organizational plaintiffs seek certification to represent all private nonprofit corporations and public housing authorities that own, operate, have under construction, or have filed applications to own or operate or will in the future file applications to own and operate rural housing financed under sections 514, 515, and 517[10] of the Housing Act of 1949, *as amended*, 42 U.S.C. §§ 1484, 1485, 1487 (1970), *as amended*, (Supp. V 1975), and who are otherwise eligible for and desirous of receiving rental assistance pursuant to section 521(a)(2)(A) of the 1949 Act, as amended by section 514 of the Housing and Community Development Act of 1974.

■ As to the individual plaintiffs' motion, the Court finds that the class for which certification is sought satisfies in all respects the requirements of Fed.R.Civ.P. 23(a). Moreover, the Court concludes that the present case falls squarely within the intended scope of subsection (b)(2), which sanctions the certification of an appropriate class when "the party opposing the class [here the Secretary] has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Defendants object essentially on the ground that class certification would be both superfluous and inappropriate since equitable relief can be fashioned which, according to the defendants, will "as a practical matter protect those people plaintiffs seek to represent." However, unlike the cases upon

---

8. Plaintiff Avon Park never submitted affidavits in support of its position on standing. The Court, therefore, was forced to rely solely on the allegations in the complaint in assessing this plaintiff's standing.

9. Excluded from this class, however, are those tenants residing in the Fred Young Farm Labor Camp owned and operated by the Housing Authority of the County of Riverside, California, for whom an action challenging a rent increase for failure to provide rural rent supplements was filed on March 8, 1976. *Lopez v. Butz*, Civ. S–76–132 (E.D.Cal.)

10. Plaintiffs' motion for class certification seeks to include in the class organizations owning and operating housing financed under section 516 of the 1949 Act, 42 U.S.C. § 1486 (1970), *as amended*, (Supp. V 1975), instead of section 517, 42 U.S.C. § 1487 (1970), *as amended*, (Supp. V 1975). Inasmuch as the section 514 rural rent supplement program applies to section 517 funded housing and not to section 516 funded housing, *see* note 4 *supra*, the Court assumes that the plaintiffs intended to request inclusion of the former.

which defendants rely for this argument,[11] certification in the present case would not complicate or delay the disposition of this case. Moreover, the Court finds that the defendants would suffer absolutely no prejudice as a result of class certification; at the same time, certification would assure the class members that the defendants could not evade their statutory responsibilities by refusing, as did the Department of Housing and Urban Development in a series of "section 236 operating subsidy" cases, to implement the program at issue on a nationwide basis.[12] Accordingly, the Court concludes that the individual plaintiffs' motion for class certification should be granted.

■ As to the organizational plaintiffs' motion, the Court is unable to grant the class certification in its entirety. For the reasons indicated in Part I(B) of this opinion, the Court finds that those organizations that have not yet had funding approved for specific multifamily housing projects pursuant to section 514, 515, or 517 of the 1949 Act do not have standing to challenge the Secretary's refusal to implement section 514 of the 1974 Act. Thus, the Court cannot certify the class to the extent that it contains organizations that have merely filed for "qualified" funding. However, inasmuch as the Court finds that the named, organizational plaintiffs satisfy completely the requisites of Fed.R.Civ.P. 23(a) and (b)(2) with respect to those organizations that own and/or operate housing funded pursuant to, or that have had or in the future in fact have applications approved for housing to be funded pursuant to either section 514, 515 or 517 of the 1949 Act, and that have applied and are otherwise eligible for rent assistance pursuant to section 514 of the 1974 Act, the Court will certify the

named organizational plaintiffs as representatives of the described class.

### III. *The Cross-Motions for Summary Judgment*

■ Plaintiffs assert three arguments in support of their motion for summary judgment: (1) the Secretary's duty to implement section 514 is mandatory, (2) the Secretary has abused such discretion as the Act may confer upon him with regard to section 514, and (3) the Secretary has violated the Impoundment Control Act of 1974 by not complying with its reporting requirements. There being no material facts in dispute, the Court, for the following reasons, concludes that summary judgment for the plaintiffs is warranted because the Secretary has abused his limited discretion under section 514.

### (A) *The Nature of the Duty Imposed Upon the Secretary by Section 514*

The initial sentence of section 514 provides:

> The Secretary . . . may make, and contract to make, assistance payments to the owners of [rental housing receiving loans under specified statutory programs] in order to make available to low-income occupants of such housing rentals at rates commensurate to income and not exceeding 25 per centum of income.

As a threshold matter, it is clear that Congress' use of the word "may" in this first sentence establishing the program is not determinative of whether Congress intended to impose a mandatory duty upon the Secretary. *Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848, 854 (1974). As the Court of Appeals for this Circuit stated in *Thompson v. Clifford*,

11. *See, e. g., Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144, 164 (D.D.C.1976); *United Farmworkers of Florida Housing Project, Inc., v. City of Delray Beach*, 493 F.2d 799, 812 (5th Cir. 1974).

12. The statutory sections which were the basis of this series of actions are 12 U.S.C. §§ 1715z–1(f)(3), (g) (1970), *as amended*, (Supp. V 1975). Although at least nine district courts through-

out the country had held these sections to be mandatory as of June 1, 1976, HUD continued to refuse to implement the program on a nationwide basis. Thus, Judge Pratt of this District certified a nationwide class of plaintiffs and ordered the Secretary of HUD to implement the contested program nationwide. *Underwood v. Hills*, 414 F.Supp. 526 (D.D.C.1976).

132 U.S.App.D.C. 351, 408 F.2d 154, 158 (1968):

> "May" ordinarily connotes discretion, but neither in lay nor in legal understanding is the result inexorable. Rather, the conclusion to be reached "depends upon the context of the statute, and on whether it is fairly to be presumed that it was the intention of the legislature to confer a discretionary power or to impose an imperative duty."

Since the intent of Congress cannot be ascertained from the language of section 514 alone, this Court must examine other indicia of legislative intent. Proposals for the rural rent supplement program were contained in both the House and Senate committee bills which eventuated in the enactment of the omnibus 1974 Act. Both section 415 of Title IV of H.R. 15361, 93d Cong., 2d Sess. (1974), as reported by the House Committee on Banking and Currency, and section 513 of Chapter V of S. 3066, 93d Cong., 2d Sess. (1974), as reported by the Senate Committee on Banking, Housing and Urban Affairs, contained the same language ultimately enacted in section 514. The House committee report, H.R.Rep. No. 93–1114, 93d Cong., 2d Sess. 35 (1974), stated:

> [This section] would authorize a rent supplement program for FmHA multi-family housing programs under sections 514 and 515. This section, which is comparable to HUD's rent supplement program, would make rental housing available to low-income families at a rate not to exceed 25 percent of income. . . .
>
> The higher incidence of poverty and generally lower median incomes in rural areas, coupled with the critical need for additional housing serving very low income families, provide adequate justification for this special assistance. Enactment of this important authority is long overdue.

The only significant differences in the Senate report's description of the program were (1) the first sentence began "[This section] would amend section 521 of the Housing Act of 1949 to establish a rent supplement program . . .", and (2) the last paragraph was not contained in the Senate report. See S.Rep. No. 93–693, 93d Cong., 2d Sess. 69 (1974), U.S.Code Cong. & Admin.News 1974, pp. 4273, 4337.

Neither of these descriptions offers much assistance to the Court in inferring congressional intent. While the House Report indicates that that body interpreted "may" to mean the same as the phrase "is authorized," the latter phrase could itself be intended to impose either a discretionary or a mandatory duty. Furthermore, since both the House and Senate provisions on the rural rent supplement program were the same, the Conference Report, H.R.Rep. No. 93–1279, 93d Cong., 2d Sess. (1974), U.S. Code Cong. & Admin.News 1974, p. 4449, contained no discussion of the program.

The Court, therefore, must next examine the language and history of other sections of the 1974 Act in an effort to infer congressional intent with respect to section 514. See 2A Sutherland Statutory Construction, § 51.02 (Sands 4th ed.). Section 505(a) of the 1974 Act, 42 U.S.C. § 1471(e), which was enacted as part of the same Title that contains section 514, offers an excellent basis for comparison since it also uses the word "may". The first sentence of section 505(a) provides:

> The Secretary may establish procedures whereby borrowers under this subchapter may make periodic payments for the purposes of taxes, insurance, and such other necessary expenses as the Secretary may deem appropriate.

Unlike section 514, this program was not proposed in identical form by both the House and Senate. Section 504 of the Senate bill, S. 3066, supra, used the word "shall" in place of the word "may" in the first sentence. Section 413 of the House bill, H.R. 15361, supra, was retained in full by the Conference Committee, and the Conference Report clearly indicates that the conferees were fully aware of the ramifications of their deliberate choice of language. In rejecting the Senate version, they stated:

The Senate bill directed the Secretary of Agriculture to establish procedures under which he would administer escrow accounts at the option of FmHA borrowers. The House amendment is similar except that it *authorizes* rather than *directs* the Secretary to establish such procedures.

H.R.Rep. No. 92–1279, *supra*, at 159, U.S. Code Cong. & Admin.News 1974, at p. 4484 (emphasis added).

■ This express rejection of the mandatory provision of the Senate bill is significant for two reasons. First, it clearly demonstrates that, in giving specific consideration to the rural housing programs established by Title V of the 1974 Act, Congress was not only aware of the significance of its choice of language, but was also careful in its actual choice of words. Second, it indicates that Congress knew that some of its programs for the benefit of low-income residents of rural areas might not be implemented.[13] Accordingly, the Court holds that section 514 does not impose a mandatory duty upon the Secretary. In so holding, however, the Court in no way seeks to imply that Congress intended section 514 to confer upon the Secretary unlimited discretion. The Court merely holds that Congress did not mandate that the Secretary implement or continue the rural rent supplement program under any and all circumstances. Rather, by its deliberate choice of language, Congress manifested its determination that circumstances might arise such that the Secretary should be accorded some latitude to decide whether implementation or continuation of the program would serve the needs of the low-income residents of rural areas. *Cf. Commonwealth of Pennsylvania v. Lynn, supra.*

### (B) *The Scope of the Secretary's Authority*

Having decided that section 514 permits the Secretary some discretion, the Court must next determine whether his decision to enter into the *Memorandum of Understanding* with HUD, thereby deferring to HUD's "section 8" program[14] rather than implementing section 514, was "within the scope of his authority." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) [hereinafter, *Overton Park*]. In other words, the Court must ascertain whether, and under what conditions, Congress intended to permit the Secretary to substitute for the section 514 rural rent supplement program another similar program (section 8) under the auspices of a separate government department (HUD).

■ It is clear, of course, that the Secretary cannot transgress the limits on his discretion imposed by Congress.

> It is not [an agency's] prerogative to disagree with Congressional policy and refuse to implement it. An administrative agency is required to effectuate, not ignore, Congressional intent, whether the agency agrees with Congress or not. The judicial branch has the function of requiring the executive (or administrative) branch to comply with the requirements set up by the legislative branch.

*Ross v. Community Services, Inc.*, 396 F.Supp. 278, 286 (D.Md.1975), *aff'd per curiam*, 544 F.2d 514 (4th Cir. 1976), *citing National Automatic Laundry & Cleaning Council v. Shultz*, 143 U.S.App.D.C. 274, 443 F.2d 689, 695 (1971). However, whereas the limits to the Secretary's discretion in *Overton Park* were explicitly incorporated in the

**13.** The plaintiffs have referred the Court to *post*-enactment statements by legislators, particularly Senator Humphrey, that manifest congressional dissatisfaction with the Secretary's initial refusal to implement section 514. *See, e. g.,* 121 *Cong.Rec.* S3444–46 (daily ed. March 7, 1975). Even if the Court were to place substantial reliance on such individual statements of disapproval, *but see* n.18 *infra,* the Court concludes that such disapproval could indicate *either*·that Congress thought it had mandated

the Secretary to implement the program *or* that Congress thought that the Secretary had improperly exercised such discretion as conferred on him by section 514. Because of this ambiguity, the Court finds that the comparison of section 514 with section 505(a) provides the most secure basis for inferring congressional intent.

**14.** *See* note 3 *supra* and accompanying text.

statutes there at issue,[15] neither the Housing and Community Development Act of 1974 nor its legislative history provide any clear indication of congressional intent as to the parameters of the Secretary's discretion. This dearth of legislative guidance is, of course, not surprising. To paraphrase *Commonwealth of Pennsylvania v. Lynn, supra,* 501 F.2d at 857, "When Congress establishes a new program, however novel or untested, it does not normally express itself on the question of what the executive officer charged with its administration should do if and when he has reason to believe that . . . the policies he is obliged to serve" can be effectuated by another program implemented in the new program's stead.

 It is clear that Congress enacted section 514 in recognition of the fact that rural areas were in "critical need" of housing for the poor and that the authority for this program was considered "important" and "long overdue." H.R.Rep. No. 93–1114, *quoted supra.* That Congress continues to attribute such importance to the rural rent supplement program is underscored by the legislative history of the Agriculture and Related Agencies Appropriation Bill of 1976. The House appropriations bill for 1976, H.R. 8561, 94th Cong., 1st Sess. (1975), appropriated to FmHA "such amounts as may be necessary to carry out a rental assistance program under section [514]. . . ." The Senate proposed amendments to H.R. 8561 that would have *required* that FmHA spend at least $6,000,000

under section 514. In accepting the language of the House bill because "both the House and Senate bills provide that such amounts as may be necessary are available to carry out the program," H.R.Rep. No. 94–528, 94th Cong., 1st Sess. 12–13 (1975), the Conference Committee unequivocally manifested its intent that a rural rent supplement program be implemented:

> The conferees will expect this program to be carried out so that residents of towns or cities of under 20,000 in population will receive comparable treatment to those who reside in our major metropolitan areas.

*Id.* This legislative history of the 1976 appropriations law is, in the circumstances of the present case, probably the most significant expression of congressional intent with respect to the Secretary's authority under the 1974 Housing Act.[16] This is particularly so because Congress was at the time of the enactment of the 1976 appropriations law aware of the Secretary's assertion that he had authority to utilize section 8 in conjunction with HUD in place of section 514.[17] Nevertheless, the Court is unable to derive any clear guidance even from this subsequent legislative history. On the one hand, the above-quoted statement by the Conference Committee could be read to be a direct response to the Secretary's actions: One could read the phrase "this program" to mean that the committee specifically wanted section 514 implemented by FmHA.[18] On the other hand, since Congress was aware of the Secretary's ongoing substitu-

---

**15.** The statutes that were at issue in *Overton Park* are 23 U.S.C. § 138 (1970), and 49 U.S.C. § 1653(f) (1970). Both statutes provide that the secretary "shall not approve any program or project" requiring the use of parkland "unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park."

**16.** Subsequent legislative history, particularly when "approved" by the Congress as a whole, is often the most revealing expression of legislative intent. *See, e. g., Commonwealth of Pennsylvania v. Lynn, supra,* 501 F.2d at 858 n. 33; *Sioux Valley Empire Electrical Association, Inc. v. Butz,* 504 F.2d 168, 173 (8th Cir. 1974);

*Dubose v. Hills,* 405 F.Supp. 1277, 1289 (D.Conn.1975).

**17.** *See Hearings on H.R. 8561 Before the Subcomm. on Agriculture and Related Agencies of the House Comm. on Appropriations,* 94th Cong., 1st Sess., pt. 4, at 636, 650, 694 (April 22, 1975).

**18.** Some Congressmen have expressly stated their disagreement with the Secretary's actions. *See, e. g.,* 122 *Cong.Rec.* S10. 218–19 (daily ed. June 23, 1976) (statement of Senator Humphrey). However, such expressions of individual legislators are generally not accorded substantial weight. *See* 2A *Sutherland Statutory Construction* § 48.13 (Sands 4th ed.).

tion of the section 8 program, one could interpret the Committee's failure to disapprove explicitly of the Secretary's action as an implicit approval so long as the residents of rural areas in fact receive "comparable treatment to those who reside in major metropolitan areas." [19]

In view of the ambiguity of even this subsequent legislative history, it is the duty of the Court "to favor an interpretation [of the relevant statutory sections] which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies difficult of fulfillment." *National Petroleum Refiners Association v. FTC*, 157 U.S.App.D.C. 83, 482 F.2d 672, 689 (1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). There is little precedent to guide this Court's application of this canon of construction where the executive asserts that it has the authority to substitute one legislative program for another. In the only other similar case to which the Court has been directed, *Sioux Valley Empire Electric Association, Inc. v. Butz*, 504 F.2d 168 (1974), the Eighth Circuit held that the Secretary of Agriculture had no authority to substitute insured and guaranteed loans under the Rural Development Act of 1972, 7 U.S.C. §§ 1926 *et seq.*, for direct loans under the Rural Electrification Act of 1936, 7 U.S.C. §§ 901 *et seq.* It inferred "that failure to include [a provision allowing the Administrator 'to terminate the program for reasons unrelated to achieving the goals of the act'] is strong evidence that Congress did not intend to grant such discretion to the Administrator." *Id.* at 178. *Cf. State Highway Commission v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973).

This Court concludes that because of the importance attributed by Congress to the rural rent supplement program a similar inference should be drawn in the present case. Accordingly, if the Secre-

tary's decision to defer to HUD's section 8 program is premised on reasons "unrelated to achieving the goals of the act," the Court would conclude that the Secretary has exceeded the scope of his authority under the Act. However, if the Secretary's decision not to implement section 514 is based on a determination that the substitution of section 8, as implemented pursuant to the *Memorandum of Understanding*, would *promote* the achievement of the rural rent supplement program's goals, the Court would conclude that the Secretary's actions are within the scope of his implied authority under the Act. In other words, only a determination that section 8 will *better* effectuate the rural rent supplement program's goals will suffice to permit the Secretary to exercise discretion to defer to HUD's section 8 program.

#### (C) *Review of the Secretary's Decision*

This interpretation of the statutory provisions here in issue compels the Court to review two separate "levels" of the Secretary's decision.[20] First, the Court must ascertain whether, on the facts of the present case, the Secretary properly construed the scope of his authority. *Overton Park, supra*, 401 U.S. at 417, 91 S.Ct. 814. In other words, the Court must determine whether the Secretary actually based his decision not to implement section 514 on a determination that implementation of HUD's section 8 program pursuant to the *Memorandum of Understanding* would promote the achievement of the goals of the rural rent supplement program. Second, assuming that the Secretary has based his decision on such a determination, the Court must then review this determination to ascertain whether it is "sustainable on the administrative record made." *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). This requires the Court to ensure that the Secretary's deter-

---

19. *Cf. Commonwealth of Pennsylvania v. Lynn, supra*, 501 F.2d at 859.

20. *See generally* Nathanson, *Probing the Mind of the Administrator: Hearing Variations and*

*Standards of Judicial Review under the Administrative Procedure Act and Other Federal Statutes*, 75 Colum.L.Rev. 721, 762–68 (1975).

mination was "based on a consideration of the relevant factors." *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir. 1976); *Overton Park, supra*, 401 U.S. at 416, 91 S.Ct. 814. It also requires the Court to ensure that the decisionmaker has taken a "hard look" at these factors and has "genuinely engaged in reasoned decision-making." *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). That is, the reviewing court must assess whether the decisionmaker "demonstrably has given reasoned consideration to the issues, and has reached a result which rationally flows from its conclusions." *National Association of Food Chains, Inc. v. ICC*, 175 U.S.App.D.C. 346, 535 F.2d 1308, 1315 (1976).

▇▇▇ With regard to the first level of review, the Court has carefully scrutinized the entire record herein. The Court concludes that the Secretary did not base his decision not to implement the section 514 rural rent supplement program on a determination that section 8, as implemented pursuant to the *Memorandum of Understanding*, would promote the achievement of the rural rent supplement program's goals.

The entire history of the Secretary's refusal to implement section 514 compels this conclusion. As early as November 1974, the Secretary explained that his decision not to implement the rural rent supplement program was premised on budgetary considera-

tions.[21] In later correspondence between the Department and Congress concerning section 514, the Secretary, in addition to voicing his view that the section 514 rural rent supplement program "cannot be effective within any reasonable cost," stated for the first time that section 8 "may provide an alternative to rent supplements."[22] Then, in April, in testimony before a subcommittee of the House Appropriations Committee, Frank B. Elliott, Administrator of the FmHA, while continuing to question the cost-effectiveness of section 514, argued for the first time that section 8 "offers essentially the same benefits" as section 514.[23] Finally, in an affidavit filed in support of defendants' motion for summary judgment herein, Mr. Elliott indicates that he made the decision not to implement section 514 and that he based this decision only "in part" on the existence of section 8 as an alternative to section 514. Affidavit of May 21, 1976.

Nowhere in any of these explanatory statements is there even a suggestion that the Secretary based his decision not to implement section 514 on a determination that the substitution of section 8 would promote the achievement of the rural rent supplement program's goals. Indeed, the only evidence of any such consideration was adduced in direct response to an Order by this Court on September 17, 1976, specifically requesting a comparison of section 514 and section 8.[24] In that response, Mr. Elliott for the first time asserted "that the HUD sec-

---

21. *Oversight on Rural Housing Programs, Hearings Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking, Housing and Urban Affairs*, 93d Cong., 2d Sess. 309–10 (1974) (testimony of James E. Bostic, Jr., Deputy Asst. Secretary for Rural Development).

22. Letter from William Erwin, Asst. Secretary, to Hon. Gale McGee, Chairman, Senate Subcomm. on Agriculture, Environmental, and Consumer Protection (Jan. 30, 1975), Appendix C, Plaintiff's Motion for Summary Judgment.

23. *See* Appendix F, Plaintiff's Motion for Summary Judgment.

24. This order was issued by the Court because the Court believed that more complete development of certain facts was necessary before the

Court could appropriately rule on the cross-motions for summary judgment. The Order requested the parties to respond to four questions regarding how section 8 compared with section 514. These questions were as follows:

(1) whether HUD's "section 8" program, to which the Secretary of Agriculture has deferred rather than implementing section 514, is now providing or will provide benefits comparable to those which would be available if section 514 were implemented by the Secretary of Agriculture; and

(2) whether, and to what extent, HUD's "section 8" program is serving or will serve the same classes of persons as would be served if section 514 were implemented by the Secretary of Agriculture; and

(3) whether, and to what extent, the intended beneficiaries of section 514 are or will be

tion 8 program provides benefits at least as liberal as those that would have been provided had FmHA implemented section 514." Affidavit of November 2, 1976, at 2. Similarly, only in response to the Court's Order did Mr. Elliott assert that the coordinated effort by HUD and FmHA would provide a more effective delivery system for rural rent supplement benefits than would be possible under section 514. *Id.* at 6. These assertions are, in the opinion of the Court, not supplementary articulations of the reasoning behind the original decision not to implement section 514. Rather, these assertions appear to be merely *post hoc* rationalizations "offered for the first time in litigation affidavits" in an effort to justify a decision already reached. *Local 814, Teamsters v. NLRB,* 546 F.2d 989, 992 (D.C.Cir. 1976). Accordingly, the Court concludes that the record demonstrates, both by positive indication and by negative inference, that the Secretary's decision not to implement section 514 was not based on permissible grounds, and therefore that he has acted in excess of his statutory authority by not implementing section 514.

Even if this Court were able to find that the Secretary based his decision not to implement section 514 on permissible grounds and thus acted within the scope of his statutory authority, it would be unable to conclude that the Secretary's decision is "sustainable on the administrative record made." *Camp v. Pitts, supra,* 411 U.S. at 143, 93 S.Ct. at 1244. The Court has been presented with neither an administrative record nor subsequent affidavits evidencing that the Secretary made a rational, considered comparison of section 514 and section 8. This lack of reasoned analysis of the "relevant factors" is manifestly demonstrated by the defendants' response to the questions propounded by the Court in its September 17, 1976 Order. The Court rec-

ognizes the difficulties inherent in any comparison of two programs for which the respective implementing regulations are as yet unformulated. Nevertheless, reasoned decision-making demands more from the Secretary than the purely speculative analysis of how section 514 "might" have been implemented, which apparently provided the basis for the decision here in issue. As Mr. Elliott, the FmHA Administrator, acknowledges, "A detailed comparison of HUD's section 8 program and section 514 could properly be made only after all policy decisions have been finalized as to how section 514 would legally and administratively be implemented." Affidavit of November 2, 1976. It appears to the Court that no study was ever made of how FmHA would or should implement section 514. Without ruling that the Secretary must necessarily *finalize* all policy decisions before deciding to substitute one program for another, the Court holds that at the very least the Secretary should have sufficiently developed implementation plans to permit him (1) to assess rationally section 514's viability and effectiveness, and (2) to make a "detailed comparison" of the two programs. Even when "[v]iewed in the most favorable light," the Secretary's decision is therefore "lacking in the sort of reasoned consideration that is necessary for judicial review." *National Association of Food Chains, Inc. v. ICC, supra,* 535 F.2d at 1318. As the Court of Appeals for this Circuit recently declared,

> We may not reverse agency action when a rational basis has been presented, and it would be equally irresponsible for us to affirm agency action when no rational basis is apparent.

*Id.* Accordingly, the Court must conclude that the Secretary's decision not to implement section 514 was an abuse of discretion and cannot be affirmed.[25]

affected by the fact that the Secretary of HUD rather than the Farmers Home Administration [FmHA] under the Secretary of Agriculture is administering the rent supplement program; and

(4) whether the Secretary of HUD has the same capacity (i. e. offices, facilities, person-

nel, etc.) to serve the intended beneficiaries of section 514 as the Secretary of Agriculture has through and under the FmHA.

**25.** It is clear that the general standard of review in this Circuit of nonadjudicatory agency action is provided by 5 U.S.C. § 706(2)(A),

(D) *The Impoundment Control Act of 1974*

 Plaintiffs' final claim [26] is that the Secretary's failure to comply with the reporting requirements of the Impoundment Control Act of 1974, 31 U.S.C. §§ 1400 *et seq.* (Supp. V 1975), warrants the award of relief to the plaintiffs in the present action. Although the Impoundment Control Act clearly enunciates Congress' disapproval of unauthorized impoundments by the Executive Branch, the Court concludes, based on its examination of both the language and history of the statute, that Congress did not intend the Act to create a claim upon which relief can be granted to individuals in cases where the executive has failed to report to Congress the withholding of funds or contract authority. Instead, Congress expressly provided that such suits could be brought by the Comptroller General, and even he could bring such enforcement suits only after receiving the tacit approval of Congress in each particular case.[27] 31 U.S.C. § 1406. *See* S.Rep. No. 93–924, 93d Cong., 2d Sess. 77 (1974). This limited enforcement provision when read in conjunction with the Act's introductory provision which states that nothing in the Act "shall be construed as . . . affecting in any way the claims or defenses of any party to litigation concerning any impound-

ment," 31 U.S.C. § 1400, persuades the Court that the Act cannot be read to create a claim upon which relief can be granted to the plaintiffs in the present case. *See* Mills & Munselle, *Unimpoundment: Politics and the Courts in the Release of Impounded Funds,* 24 Emory L.J. 313, 339–41 (1975).

(E) *Conclusion*

In conclusion, the Court, on the basis of the foregoing, finds that the plaintiffs' motion for summary judgment, insofar as it requests a Declaratory Judgment, shall be granted upon the ground that the decision of the Secretary of Agriculture not to implement section 514 of Title V of the Housing and Community Development Act of 1974 was both in excess of his statutory authority and an abuse of his discretion. The defendants' cross-motion for summary judgment shall be denied. In addition, the Court will remand the case to the Secretary of Agriculture for further consideration, by him personally, consistent with this Opinion and accompanying Order. Within thirty (30) days of the date hereof, the Secretary shall advise and report to the Court as to how soon the defendants will be able to determine whether section 8 will *better* effectuate the goals of the rural rent supple-

which requires the reviewing court to determine that the agency action was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See National Association of Food Chains, Inc. v. ICC, supra,* 535 F.2d at 1313–14. This standard requires affirmance of agency action "if a rational basis exists for the agency's decision." *Ethyl Corp. v. EPA, supra,* 541 F.2d at 34. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 437 (1974).

Nevertheless, the Court of Appeals for this Circuit applied a different standard of review in *Commonwealth of Pennsylvania v. Lynn, supra,* on the ground that in that case "the discretion vested in the Secretary [was] a narrow one, and the potential for mischief in the event of its abuse [was] great." *Id.* at 862. Thus, the court of appeals held that it was appropriate for it "to extend its inquiry beyond the 'rational basis' that elsewhere suffices to support an administrative decision" and to inquire into the "reasonableness" of the decision. *Id. Accord, Dubose v. Hills, supra.* Whether

this case or the general rule controls the present case is problematical. This Court, however, need not address this question at this time for the Secretary's decision not to implement section 514 cannot be affirmed even under the more deferential "abuse of discretion" standard of § 706(2)(A).

**26.** This claim is not mooted by the Court's finding that the Secretary abused his discretion because the Impoundment Control Act arguably requires a court to mandate the implementation of the impounded program, a more extensive form of relief than that granted herein.

**27.** The Act states: "No civil action shall be brought by the Comptroller General under this section until the expiration of 25 calendar days of continuous session of Congress following the date on which an explanatory statement by the Comptroller General of the circumstances giving rise to the action contemplated has been filed with the Speaker of the House of Representatives and the President of the Senate." 31 U.S.C. § 1406.

ment program as expressed by Congress in section 514.

An Order in accordance with the foregoing Memorandum Opinion will be issued of even date herewith.